## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

United States of America,                              Case No. 21-cr-250 (JRT/TNL)

                    Plaintiff,

v.                                                                **REPORT &**
                                                                **RECOMMENDATION**

Jing Chen (1),
Ying Chen (2),
Li Yang (3), and
Xinhua Xiong (4),

                    Defendants.

Laura Provinzino and Ana H. Voss, Assistant United States Attorneys, United States Attorney's Office, 300 South Fourth Street, Suite 600, Minneapolis, MN 55415 (for the Government);

Lauren Campoli, The Law Office of Lauren Campoli, PLLC, 7300 France Avenue, Suite 405, Minneapolis, MN 55435 (for Defendant Jing Chen);

Jean M. Brandl, Assistant Federal Defender, Office of the Federal Defender, 300 South Fourth Street, Suite 107, Minneapolis, MN 55415 (for Defendant Ying Chen);

Glenn P. Bruder, Mitchell, Bruder & Johnson, 9531 West 78th Street, Suite 210, Eden Prairie, MN 55344 (for Defendant Li Yang); and

Piper Kenney Wold, Law Office of Piper L. Kenney, 331 Second Avenue South, Suite 705, Minneapolis, MN 55401 (for Defendant Xinhua Xiong).

## I. INTRODUCTION

This matter is before the Court, United States Magistrate Judge Tony N. Leung, on

pretrial motions.

Defendant Jing Chen has filed the following motions:

1. Motion to Suppress Evidence Due to Non-Disclosure, ECF No. 85;

2. Motion to Dismiss Indictment for Failure to State an Offense, ECF No. 89;

3. Motion to Dismiss First and Third Count of Defendant's Charge Due to Statute of Limits Expiration, ECF No. 91; and

4. Motion to Suppress Evidence Pursuant to Unlawful Search and Seizure, ECF No. 92.

Defendant Ying Chen has filed the following motions:

1. Motion to Suppress Evidence Obtained as a Result of Unlawful Search and Seizure, ECF No. 188; and

2. Motion to Suppress Statements as a Result of Unlawful Interrogation, ECF No. 191.

Defendant Li Yang has filed the following motions:

1. Motion to Dismiss Count 1 of the Indictment, ECF No. 178;

2. Motion to Suppress Statements, Admissions and Answers, ECF No. 179; and

3. Motion to Suppress Evidence Obtained as a Result of a Search and Seizure, ECF No. 181.

Defendant Xinhua Xiong has filed the following motion:

1. Pretrial Motion for Dismissal of Indictment, ECF No. 56.

These motions have been referred to the undersigned for a report and recommendation to the district court, the Honorable John R. Tunheim, District Judge of the United States District Court for the District of Minnesota, under 28 U.S.C. § 636 and D. Minn. Local Rule 72.1.

A hearing on the motions was held on December 9, 2022. ECF No. 220. Laura Provinzino appeared on behalf of the Government. Lauren Campoli appeared on behalf of Defendant Jing Chen. Jean M. Brandl appeared on behalf of Defendant Ying Chen. Glenn P. Bruder appeared on behalf of Defendant Li Yang. Daniel S. Le appeared on behalf of Defendant Xinhua Xiong.[1]

The Court heard testimony from one witness, Defendant Ying Chen. The Government offered and the Court received:

1. Government Exhibit 1, the search warrant for safe deposit box number 00041 at Wells Fargo Bank, located at 2414 Mercantile Drive in Eau Claire, Wisconsin, No. 18-mj-68 (SLC);

2. Government Exhibit 2, the return for the search warrant for safe deposit box number 00041 at Wells Fargo Bank;

3. Government Exhibit 3, the search warrant for safe deposit box number 2968 at U.S. Bank, located at 131 South Barstow Street in Eau Claire, Wisconsin, No. 18-mj-68 (SLC);

4. Government Exhibit 4, the return for the search warrant for safe deposit box number 2968 at U.S. Bank;

5. Government Exhibit 12, the search warrant and return for Defendant Jing Chen's residence, located on 31st Avenue North in Plymouth, Minnesota, No. 18-mj-396 (FLN);

6. Government Exhibit 13, the search warrant and return for Defendant Ying Chen's residence, located on Rockford Road in Plymouth Minnesota, No. 18-mj-402 (FLN);

7. Government Exhibit 14, the search warrant and return for Defendant Li Yang's residence, located on Stillwater Avenue East in Maplewood, Minnesota, No. 18-mj-400 (FLN);

---

[1] On January 17, 2023, Attorney Daniel S. Le filed a Motion to Withdraw and For Appointment of Substitute Counsel, stating that he accepted another position and will no longer be practicing criminal law. ECF No. 234. On January 19, 2023, the Court granted Attorney Le's motion and appointed Attorney Piper Kenney Wold as substitute counsel for Defendant Xinhua Xiong. ECF No. 239.

8.  Government Exhibit 15a, the first audio-recorded statement of Defendant Li Yang on May 10, 2018;

9.  Government Exhibit 15b, the first transcribed statement of Defendant Li Yang on May 10, 2018;

10. Government Exhibit 16a, the second audio-recorded statement of Defendant Li Yang on May 10, 2018;

11. Government Exhibit 16b, the second transcribed statement of Defendant Li Yang on May 10, 2018;

12. Government Exhibit 17a, the audio-recorded statement of Defendant Ying Chen on May 10, 2018; and

13. Government Exhibit 17b, the transcribed statement of Defendant Ying Chen on May 10, 2018.

Post-hearing briefing is now complete, and these motions are ripe for a determination by the Court.

## II. ANALYSIS

### A. Motion to Suppress Evidence Due to Non-Disclosure

On February 4, 2022, Defendant Jing Chen filed a Motion to Suppress Evidence Due to Non-Disclosure, ECF No. 85. She moves "for an Order suppressing any undisclosed evidence that has yet to be made available to defense counsel" in violation of: (1) Federal Rule of Criminal Procedure 16(d)(2); (2) the Court's first discovery Order on December 22, 2021, ECF No. 42; and (3) and the Court's second discovery Order on January 11, 2022, ECF No. 69. ECF No. 85 at 1. According to Defendant Jing Chen, the Government failed to disclose 2 terabytes of data as of the February 4, 2022 motions filing deadline. *Id*. She argues that this undisclosed evidence should be suppressed in its entirety

because it "violates the Court's unambiguous discovery Orders, prejudices [her] right to effective assistance of counsel, due process, speedy trial, and right to confrontation, and given a three year and seven-month history of the case, [the non-disclosure] is without good cause." *Id*. at 1-2. She states that the pattern of non-disclosure has forced continuances and speedy trial waivers and warrants the sanction of suppression. *Id*. at 2; *see also* Def.'s Post Hearing Mem. in Supp. at 4, ECF No. 237.

The Government opposes the motion. It contends that it provided multiple rounds of discovery to Defendants, accommodated evidence reviews, and disclosed terabytes of data of the physical evidence in law enforcement custody. Gov't Consolidated Resp. at 10, ECF No. 198; Gov't Post Hearing Resp. at 19, ECF No. 243. The Government notes that it made much of the evidence available for inspection even prior to indictment, and has since produced additional discovery in December 2021, and January, February, August, and October 2022. *Id*. Further, the Government contends that all discovery has been provided to Defendant Jing Chen's counsel on a hard drive for counsel to review at her leisure, in addition to the grand jury transcripts and additional documents specific to the overt acts alleged in the Indictment. *Id*.

The Court is unpersuaded by Defendant Jing Chen's argument that all evidence allegedly produced after the deadline to do so should be suppressed under Rule 16 of the Federal Rules of Criminal Procedure. Rule 16 requires the Government to allow a defendant to inspect and copy any item in its control that is "material to preparing the defense," that the Government intends to use in its case-in-chief at trial, or that "was obtained from or belongs to the defendant." Fed. R. Crim. P. 16(a)(1)(E). If the

Government fails to comply with that requirement, the Court has broad authority to sanction the Government, including prohibiting the introduction of the undisclosed evidence. *Id*. at 16(d)(2). In considering appropriate sanctions, the Court considers the reason for the delayed production of the evidence, the prejudice to the defendant, and whether a lesser sanction would ensure the Government's future compliance. *United States v. Sims*, 776 F.3d 583, 585-86 (8th Cir. 2015).

While the Court does not condone delays in discovery production, "suppression is too harsh a penalty here." *See United States v. Deleon-Bayardo*, No. 07-cr-99 (JRT/SRN), 2008 WL 141761, at *24 (D. Minn. Jan. 14, 2008). In designating this case as complex in March 2022, the Court noted that the Government was working to produce "massive" amounts of discovery. *See* ECF No. 104 at 1, 4. At the time, the Government was "in the process of transferring two terabytes of data onto hard drives provided by defense counsel, including the native content of returns from numerous email search warrants and photocopies of the physical items and forensic evaluations of the digital devices seized pursuant to more than 40 search warrants." *Id*. at 2 (citing ECF No. 101 at 2). In light of the complexity of the case and the volume of discovery, it is not unreasonable that the Government needed additional time to produce some of the materials, and the Court finds that the prosecution did not act in bad faith in making certain untimely disclosures. In fact, as the Government notes, the Government provided some discovery pre-indictment. Gov't's Post Hearing Resp. at 19. The Government also accommodated two evidence reviews of the physical evidence in law enforcement custody for Defendant Jing Chen, on January 19 and 25, 2022, and later provided terabytes of data of the physical evidence when

flash drives were provided by defense counsel. *Id.*; *see also* ECF No. 216 at 6.

Moreover, Defendant Jing Chen has not demonstrated any prejudice to her defense. To the extent the evidence that Defendant Jing Chen sought exists and is not immune from discovery, the Government has produced or will produce it. She received the discovery well in advance of the motions hearing. Trial is still months away, and she has ample time to review the evidence the Government intends to use. *See Deleon-Bayardo*, 2008 WL 141761, at *24 (citing *United States v. White Horse*, 316 F.3d 769, 774 (8th Cir. 2003)). While she complains of delays in her case, Defendant Jing Chen has not demonstrated that the late disclosure was material to her defense, in other words, that "the disposition of the suppression issues would have been different" had the evidence been disclosed on time. *See id.* (citing *Patterson v. Black*, 791 F.2d 107, 110 (8th Cir. 1986)). Accordingly, the Court recommends that Defendant Jing Chen's Motion to Suppress Evidence Due to Non-Disclosure, ECF No. 85, be denied.

**B. Motions to Suppress Evidence Pursuant to Unlawful Search and Seizure**

Defendant Jing Chen moves to suppress evidence gathered from searches of (1) her Plymouth residence on 31st Avenue North, (2) a Wells Fargo safe deposit box in Eau Claire, and (3) a U.S. Bank safe deposit box in Eau Claire. ECF No. 92 at 1. Defendant Ying Chen also moves to suppress evidence gathered from a search at her Plymouth residence on Rockford Road. ECF No. 188 at 1. Defendant Li Yang also moves to suppress evidence gathered from a search at her Maplewood residence on Stillwater Avenue East. ECF No. 181 at 1. At the hearing, the Court confirmed that Defendants seek a "four-corners" review of the warrants to determine whether there was sufficient

information contained therein to support a finding of probable cause.

"The Fourth Amendment requires that search warrants be supported by probable cause." *United States v. Tripp*, 370 Fed. App'x 753, 757 (8th Cir. 2010). "If an affidavit in support of a search warrant sets forth sufficient facts to lead a prudent person to believe that there is a fair probability that contraband or evidence of a crime will be found in a particular place, probable cause to issue the warrant has been established." *United States v. Hudspeth*, 525 F.3d 667, 674 (8th Cir. 2008) (quotation omitted); *accord Illinois v. Gates*, 462 U.S. 213, 238 (1983) ("The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place."); *see also United States v. Tellez*, 217 F.3d 547, 550 (8th Cir. 2000) ("there must be evidence of a nexus between the contraband and the place to be searched before a warrant may properly issue").

The sufficiency of the affidavit is evaluated using a totality-of-the-circumstances approach. *United States v. Augustine*, 663 F.3d 367, 372 (8th Cir. 2011). "When determining whether probable cause exists, a court does not independently evaluate each piece of information, but, rather, considers all of the facts for their cumulative meaning." *United States v. Willis*, No. 11-cr-13 (DSD/JJK), 2011 WL 1100127, at *1 (D. Minn. Mar. 14, 2011), *report and recommendation adopted*, 2011 WL 1060981 (D. Minn. Mar. 23, 2011). "Probable cause requires only a showing of fair probability, not hard certainties." *Hudspeth*, 525 F.3d at 676 (citing *Gates*, 426 U.S. at 213).

> When the issuing judge relied solely upon the supporting affidavit to issue the warrant, only that information which is found within the four corners of the affidavit may be considered in determining the existence of probable cause. The affidavit should be examined under a common sense approach and not in a hypertechnical fashion. When the affidavit is based on information from an informant, the informant's reliability, veracity, and basis of knowledge is relevant to whether the affidavit provided probable cause to support the search.

*United States v. Solomon*, 432 F.3d 824, 827 (8th Cir. 2005) (quotations and citations omitted). "Because reasonable minds may differ on whether a particular search-warrant affidavit establishes probable cause, the issuing court's determination is accorded great deference." *Willis*, 2011 WL 1100127, at *2.

### 1. Residential Search Warrants

Turning first to the search warrant affidavits for the residences of Defendants Jing Chen, Ying Chen, and Li Yang,  Department of Homeland Security ("DHS") Special Agent Charles Bautch ("SA Bautch") filed the same affidavit in support of each search warrant application.  *See generally* Exs. 12, 13, 14.  After discussing his background and experience, SA Bautch provided background on what he referred to as "Asian Massage Parlors," with much of the information coming from a report, titled *Human Trafficking in Illicit Massage Businesses*, published by a nonprofit organization.  *See* Ex. 12 ¶¶ 1-14; Ex. 13 ¶¶ 1-14; Ex. 14 ¶¶ 1-14.  SA Bautch noted that owners and operators of Asian Massage Parlors often keep cash in safe deposit boxes and store large sums of cash within their home, and often keep proceeds and evidence of the illicit sexual activities within their homes and safe deposit boxes.  *See* Ex. 12 ¶¶ 8, 13-14; Ex. 13 ¶¶ 8, 13-14; Ex. 14 ¶¶ 8, 13-

14.   He wrote that "[b]ased on information gathered in this instant investigation, law enforcement believes that [Defendants are] operating a collection of [Asian Massage Parlors] in the Twin Cities Metro Area," "bringing adult Asian females into Minnesota to work at [Asian Massage Parlors] by engaging in illicit sexual activity for profit," and "laundering the proceeds from this illicit sexual activity and using various structuring methods to hide these proceeds from reporting requirements and law enforcement." *See* Ex. 12 ¶ 15; Ex. 13 ¶ 15; Ex. 14 ¶ 15.   SA Bautch then detailed law enforcement's investigative efforts, including undercover agent operations, executing search warrants, and interviewing employees of Asian Massage Parlors, and wrote that their investigation led SA Bautch to conclude that Defendants "are members of the organized group controlling multiple [Asian Massage Parlors] in the Twin Cities metro area." *See* Ex. 12 ¶¶ 45-49; Ex. 13 ¶¶ 45-49; Ex. 14 ¶¶ 45-49.   He provided detail about each Defendant's involvement:

> Jing CHEN plays a limited role in the day-to-day activities of the [Asian Massage Parlors] and may never visit them. . . . Jing CHEN is the subscriber for many of the accounts associated with the [Asian Massage Parlors], to include phone numbers used on the Backpage advertisements, Internet service used to post Backpage advertisements, and the payment of other services. She has also traveled to banks and casinos.

> Ying CHEN has assisted workers in obtaining massage licenses and Minnesota identifications, scouted out building spaces, picked up new workers from the airport, traveled to banks and casinos, and has visited many of the [Asian Massage Parlors] on a frequent basis.

> Li YANG . . . has engaged in commercial sex acts for the benefit of the organization and has also begun to supervise other [Asian Massage Parlor] workers.

> Xinhua XIONG collects illicit cash proceeds from the [Asian Massage Parlors] and has engaged in financial transactions at various banks.

*See* Ex. 12 ¶¶ 50(a)-(f); Ex. 13 ¶¶ 50(a)-(f); Ex. 14 ¶¶ 50(a)-(f).  Further, SA Bautch wrote that he reviewed subpoenaed records from Backpage along with other financial records and found that Defendants Jing Chen, Ying Chen, and Xinhua Xiong each made payments to Backpage.  *See* Ex. 12 ¶¶ 51-53; Ex. 13 ¶¶ 51-53; Ex. 14 ¶¶ 51-53.   SA Bautch described further investigation into Defendants, including information he learned during an interview which led him to conclude that Defendants Jing Chen and Ying Chen were "the leaders of the organization."  *See* Ex. 12 ¶¶ 54-74; Ex. 13 ¶¶ 54-74; Ex. 14 ¶¶ 54-74.   He also noted the interstate nature of the organization, explaining Defendants' activities in Hudson, Wisconsin.  *See* Ex. 12 ¶¶ 172-83; Ex. 13 ¶¶ 172-83; Ex. 14 ¶¶ 172-83.

SA Bautch's affidavit also described the evidence linking each residence to the investigation.  He noted that Defendant Ying Chen's residence: was listed on massage license applications as the residence of several Asian Massage Parlor workers; IP addresses used to post Backpage advertisements for several Asian Massage Parlors were subscribed to the residence; and law enforcement observed Ying Chen travel from the residence to pick up and transport Asian Massage Parlor workers to Asian Massage Parlors and licensing bureaus, financial institutions, casinos, and the Minneapolis-St. Paul airport.  *See* Ex. 12 ¶¶ 97-102; Ex. 13 ¶¶ 97-102; Ex. 14 ¶¶ 97-102.   For Defendant Jing Chen's residence, SA Bautch noted that: emails, phone numbers, and IP addresses used to post Backpage advertisements for several Asian Massage Parlors were listed and subscribed to

the residence; law enforcement observed a vehicle registered to the residence transporting Asian Massage Parlor workers to and from Asian Massage Parlors and bringing supplies to Asian Massage Parlors; law enforcement observed Jing Chen driving a vehicle registered to the address to Eau Claire to meet with Ying Chen and Jing Chen's mother at a Wells Fargo Bank and a U.S. Bank to open bank accounts and safe deposit boxes; Defendants Jing Chen, Ying Chen, and Xinhua Xiong all receive mail at the residence; Defendant Li Yang also listed the residence as her home address; and law enforcement observed Defendant Xinhua Xiong visiting the residence before going to the post office and then to one of the Asian Massage Parlors. *See* Ex. 12 ¶¶ 103-11; Ex. 13 ¶¶ 103-11; Ex. 14 ¶¶ 103-11. With respect to Defendant Li Yang's residence, SA Bautch noted: several Asian Massage Parlor workers listed the residence as their address on massage license applications; law enforcement observed Defendant Li Yang depart from the residence and transport Asian Massage Parlor workers; law enforcement observed an individual depart from the residence, pick up a washer and dryer at a store, and deliver it to an Asian Massage Parlor; and bank records show that Defendant Ying Chen purchased the washer and dryer. *See* Ex. 12 ¶¶ 142-47; Ex. 13 ¶¶ 42-147; Ex. 14 ¶¶ 142-47.

Based on the information provided in the affidavits, SA Bautch stated that probable cause exists to search Defendants' residences. *See* Ex. 12 ¶ 204; Ex. 13 ¶ 204; Ex. 14 ¶ 204. The search warrants applications were granted. *See* Ex. 12 at 1; Ex. 13 at 1; Ex. 14 at 1. The warrants permitted law enforcement to seize a wide variety of items such as records and documents, cash, jewelry, keys, cellular telephones, travel transactions, videos and photographs, passports and identity-related documents, and supplies relating to

commercial sexual services like lingerie, among other items. *See* Ex. 12 at 4-10; Ex. 13 at 4-10; Ex. 14 at 4-10.

Defendant's Jing Chen, Ying Chen, and Li Yang all argue that the warrants are invalid because SA Bautch's statements in the warrant applications failed to establish a sufficient nexus between any criminal activity and their residences. *See* Def. Jing Chen's Motion to Suppress, ECF No. 92; Def. Jing Chen's Mem. in Supp. at 3, ECF No. 204; Def. Jing Chen's Post Hearing Mem. in Supp. at 11-12, ECF No. 237; Def. Ying Chen's Motion to Suppress, ECF No. 188; Def. Ying Chen's Reply to Gov't's Resp. at 1, ECF No. 202; Def. Li Yang's Motion to Suppress, ECF No. 181; Def. Li Yang's Post Hearing Mem. in Supp., ECF No. 235. "There must be evidence of a nexus between the contraband and the place to be searched before a warrant may properly issue. The requisite nexus between a particular location and contraband is determined by the nature of the crime and the reasonable, logical likelihood of finding useful evidence." *United States v. Colbert*, 828 F.3d 718, 726 (8th Cir. 2016) (internal quotations and citations omitted). Defendants point to specific paragraphs in SA Bautch's affidavits supporting the searches of their residences to argue that there was not a sufficient nexus between their residences and the alleged illegal activity. But the Court "does not make a determination of probable cause by examining the affidavit[s'] paragraphs individually." *United States v. Anderson*, 933 F.2d 612, 614 (8th Cir. 1991). The issuing judge's task is "to make a practical, common-sense decision whether, given *all* the circumstances set forth in the affidavit[s] before him . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Id.* (quotation omitted). As such, the affidavits "cannot be attacked paragraph by

paragraph; [they] must be evaluated as a whole." *Id*. Moreover, search warrants address probabilities not certainties, and therefore, the "affidavit[s] need only establish the *probability* of criminal activity" rather than proof beyond a reasonable doubt. *United States v. Brown*, 584 F.2d 252, 257 (8th Cir. 1978) (emphasis added). In the present case, the totality of the circumstances set forth in the affidavits support probable cause for the issuance of the warrants. The affidavits detailed precisely the large-scale investigation into interstate transportation for prostitution and the money laundering those individuals engaged in, and therefore set forth a substantial basis to conclude that probable cause existed for the warrants.

As set forth in SA Bautch's detailed 87-page affidavit, law enforcement conducted an extensive investigation into Defendants and the conspiracy alleged in this case, and they confirmed each Defendant lived at their respective residences via vehicle registration, rental applications, bank records, IP addresses, interviews with witnesses, and law enforcement surveillance, among other sources. As SA Bautch stated, owners of "Asian Massage Parlors" are known to pick up the proceeds of commercial sex acts from their "Asian Massage Parlors" regularly and often keep proceeds and evidence of the illicit activities within their homes. This makes it reasonable to believe there was a logical likelihood such evidence would be available in Defendants' residences. *See id*. In addition, keys and rental agreements to safe deposit boxes containing cash, records, identification documents, other valuables, or other documents related to the criminal enterprise are often maintained at a suspect's residence. Thus, law enforcement demonstrated probable cause that contraband or evidence of a crime would be found at Defendants' residences.

*Hudspeth*, 525 F.3d at 674; *Gates*, 462 U.S. at 238. Thus, the Court concludes that the warrants were supported by probable cause.

Defendant Jing Chen argues that the warrant to search her residence lacks probable cause because it was stale. Def.'s Mem. in Supp. at 3-4, ECF No. 204; *see also* Def.'s Post Hearing Mem. in Supp. at 11-13, ECF No. 237. According to Defendant Jing Chen, "at the time the warrant was applied for, [her] business, Zentastic spa, had been closed for over 6 months." Def.'s Mem. in Supp. at 4; Def.'s Post Hearing Mem. in Supp. at 11. Further, she contends that the warrants were not issued until May 2018, but the affidavit contains information which was obtained by law enforcement in 2016. Def.'s Post Hearing Mem. in Supp. at 11. These arguments are similarly unavailing.

Probable cause must exist "at the time of the search and not merely at some earlier time." *United States v. Jeanetta*, 533 F.3d 651, 654 (8th Cir. 2008) (citation omitted). "There is no bright-line test for determining when information on a warrant has become stale." *United States v. Lemon*, 590 F.3d 612, 614 (8th Cir. 2010) (quoting *United States v. Pruneda*, 518 F.3d 597, 604 (8th Cir. 2008)). "The timeliness of the information supplied in an affidavit depends on the circumstances of the case, including the nature of the crime under investigation; the lapse of time is least important when the suspected criminal activity is continuing in nature and when the property is not likely to be destroyed or dissipated." *United States v. Horn*, 187 F.3d 781 (8th Cir. 1999) (citing *United States v. Koelling*, 992 F.2d 817, 822 (8th Cir. 1993)). Here, SA Bautch indicated that Defendants' Asian Massage Parlor conspiracy had been going on for years and was ongoing. He set forth evidence showing that the nature of the criminal activity was not

such that evidence of the crime would rapidly dissipate.  Instead, from the information provided by SA Bautch, it appears that Defendants were operating as an efficient and sophisticated business.  *See United States v. Davis*, 867 F.3d 1021, 1028 (8th Cir. 2017) (warrant not stale because the underlying criminal activity was continuing in nature); *see also United States v. Ortiz-Cervantes*, 868 f.3d 695, 700 (8th Cir. 2017) (warrant not stale where evidence supported law enforcement's inference that defendant had an ongoing conspiracy).  Thus, there was a fair probability that if Defendants had evidence resulting from the alleged conspiracy, it would still be in their possession months or even years later.  The Court therefore concludes that the evidence referenced in the warrants was not so stale as to make the warrants defective.

Defendant Jing Chen also argues that the execution of the search warrant of her residence was unlawful.   Def.'s Mem. in Supp. at 5, ECF No. 204; *see also* Def.'s Post Hearing Mem. in Supp. at 13-15, ECF No. 237.  She first contends that officers unlawfully took her essential identifying documents, like her Passport, Social Security Card, and Minnesota driver's license, even though her identity has never been at issue in this case.  Def.'s Post Hearing Mem. in Supp. at 13.  This argument is meritless, however, because the warrant, which the Court finds is supported by probable cause, specifically authorized law enforcement to seize "[a]ny passports, identity, visa, and/or immigration documents."  *See* Ex. 12 at 2.  It was therefore not improper for law enforcement to seize her identity documents.  Defendant Jing Chen also argues that the execution of the search warrant of her residence was unlawful because law enforcement took "a multitude of extraneous papers and effects outside the scope of the warrant," such as medical insurance cards and

records, ultrasound photos of her baby, and a love letter to her husband. *Id*. According to Defendant Jing Chen, the Court should suppress all items labeled as "miscellaneous documents" on the warrant return. *Id*. at 13-15. While a search warrant's execution can become unconstitutional "if the officers who execute it overstep its self-contained limits," *Walden v. Carmack*, 156 F.3d 861, 872 (8th Cir. 1998), that is not what happened here. The search warrant authorized the seizure of any and all items or things that could be evidence of the prostitution conspiracy. *See* Ex. 12 at 4-10. This included a wide array of documents and other records, including videos, photographs, and communications. *Id*. "Regardless of the fact that many of the items were 'personal property' of one or more of the [Defendants'], [Defendant Jing Chen] fail[s] to show how any of the items seized were inconsistent with the parameters of the search warrant." *See Walden*, 156 F.3d at 873. It was reasonable for the officers executing the search warrant to believe that the items seized were of such an incriminating nature as to constitute contraband or evidence of criminal activity. Thus, the Court concludes that the execution of the search warrant was not unlawful.

### 2. Safe Deposit Box Search Warrants

Defendant Jing Chen also challenges the search warrants from two safe deposit boxes in Eau Claire, Wisconsin. Def.'s Mem. in Supp. at 5-6, ECF No. 204. She contends that the Government took $340,000 from the safe deposit boxes without probable cause that the money constituted proceeds of any crime. *Id*. The Government responds that Defendant Jing Chen does not have standing to challenge the search warrants for the safe deposit boxes. Gov't's Post Hearing Resp. at 23-24, ECF No. 243. According to the

Government, the safe deposit boxes were in her mother's name, and she cannot challenge the search warrants because she does not have an expectation of privacy in her mother's safe deposit boxes. *Id*. at 23 n.4. While the Government makes a compelling argument, the Court will address the merits of Defendant Jing Chen's argument out of an abundance of caution. In doing so, the Court finds that the safe deposit box search warrants are supported by probable cause.

The search warrant affidavits for the safe deposit boxes signed by DHS Special Agent Nathan Cravatta ("SA Cravatta") are nearly identical to the affidavits signed by SA Bautch for the residences in Minnesota. *Compare* Exs. 1, 3 *with* Exs. 12, 13, 14. They include all of the information about the investigation included in the Minnesota residential search warrant affidavits, one of which was attached to the search warrant applications for the safe deposit boxes. *See* Exs. 1, 3. Thus, like the Minnesota residential search warrants, the affidavits for the safe deposit boxes detailed the large-scale investigation into interstate transportation for prostitution and the money laundering those individuals, including Defendant Jing Chen, engaged in, and therefore set forth a substantial basis to conclude that probable cause existed for the warrants. Further, SA Cravatta detailed a specific observation from December 11, 2017, in Eau Claire, Wisconsin. *See* Ex. 1 ¶ 75; Ex. 3 ¶ 75. Financial records show that on that date, Fenglan Wu (Defendant Jing Chen and Ying Chen's mother) opened two safe deposit boxes, one at a Wells Fargo Bank and the other at a U.S. Bank in Eau Claire. *See* Ex. 1 ¶¶76-77; Ex. 3 ¶¶ 76-77. On the same day, law enforcement officers observed Defendants Jing Chen and Ying Chen drive separately from Minnesota to Eau Claire and go into that same Wells Fargo Bank. *See* Ex. 1 ¶ 75; Ex. 3 ¶

75.  Defendants Jing Chen and Ying Chen then drove in tandem to the U.S. Bank in Eau Claire and were observed by law enforcement officers standing in the parking lot with their mother with the trunk to Defendant Ying Chen's vehicle open.  *Id*.  Officers then observed Defendant Ying Chen and her mother enter the bank carrying bags, and saw Defendant Jing Chen drive away.  *Id*.  In his affidavit, SA Cravatta noted that based on his experience, he "know[s] that the commercial sex industry is an intensive cash business."  *See* Ex. 1 ¶ 73; Ex. 3 ¶ 73.  "Within [Asian Massage Parlors], customers pay in cash for each sex act, and the money is . . . stored in safe deposit boxes and banks."  *See id*.  These circumstances make it reasonable to believe there was a logical likelihood such evidence would be found in the Eau Claire safe deposit boxes.  Accordingly, the Court finds that the warrants were supported by probable cause.

### 3.  Good Faith Exception

Assuming *arguendo* that the affidavits failed to establish probable cause for the residential and safe deposit box warrants, "the good-faith exception to the exclusionary rule, established in *United States v. Leon*, 468 U.S. 897 (1984), would have to be considered."  *Willis*, 2011 WL 1100127, at *3.  "Under *Leon*, the exclusionary rule is not to be applied to exclude the use of evidence obtained by officers acting in reasonable reliance on a detached and neutral [judge's] determination of probable cause in the issuance of a search warrant that is ultimately found to be invalid."  *United States v. Keele*, 589 F.3d 940, 944 (8th Cir. 2009) (quotation omitted).  "Evidence should be suppressed only if the affiant-officer could not have harbored an objectively reasonable belief in the existence of probable cause."  *United States v. Gibson*, 928 F.2d 250, 254 (8th Cir. 1991).  "If a warrant

19

is 'based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable,' an officer's reliance on the warrant cannot have been in good faith." *United States v. Goody*, 377 F.3d 834, 836 (8th Cir. 2004) (quoting *Leon*, 468 U.S. at 923 (internal quotation marks omitted)).  The court's inquiry is confined "to the objectively ascertainable question of whether a reasonably well trained officer would have known that the search was illegal despite the issuing judge's authorization." *Hudspeth*, 525 F.3d at 676 (quotation omitted).

Here, the Court finds that the officers who executed the warrants "acted in objectively reasonable reliance" on the warrants issued by the magistrate judges.  *See Gibson*, 928 F.2d at 253 (citing *Leon*, 468 U.S. at 922); *accord Goody*, 377 F.3d at 836 ("[W]e see nothing to indicate that the officers did not act with objective good faith on the [issuing judge's] probable-cause determination.").  There is nothing to indicate that the issuing magistrate judges were anything other than neutral and detached when evaluating the warrant applications.  *See Keele*, 589 F.3d at 944.  There is also nothing to indicate that SA Bautch or SA Cravatta were dishonest or reckless in preparing the affidavits.  *See Gibson*, 928 F.2d at 254 ("Suppression is an appropriate remedy if the judge, in issuing the warrant, was misled by information in the affidavit that the affiant knew or would have known it was false except for the affiant's reckless disregard for the truth.").  Finally, the affidavits were not so facially lacking in probable cause as to preclude reasonable reliance on them.  *See Hudspeth*, 525 F.3d at 676; *Gibson*, 928 F.2d at 254.

In sum, the Court finds that probable cause existed to support the warrants in question and, even if probable cause did not exist, the *Leon* good-faith exception would

apply.  Therefore, the Court recommends that Defendant Jing Chen's Motion to Suppress Evidence Pursuant to Unlawful Search and Seizure, ECF No. 92, Defendant Ying Chen's Motion to Suppress Evidence Obtained as a Result of Unlawful Search and Seizure, ECF No. 188, and Defendant Li Yang's Motion to Suppress Evidence Obtained as a Result of a Search and Seizure, ECF No. 181, be denied.

### C. Motions to Suppress Statements as a Result of Unlawful Interrogation

Defendants Ying Chen and Li Yang argue that their statements to law enforcement agents must be suppressed because they were not advised of their *Miranda* rights during custodial interrogation.  *See generally* Def. Ying Chen's Post Hearing Mem. in Supp., ECF No. 236; Def. Li Yang's Motion to Suppress, ECF No. 179; Def. Li Yang's Post Hearing Mem. in Supp., ECF No. 235.  The Government argues that *Miranda* warnings were not required because Defendants Ying Chen and Li Yang were not in custody when being questioned.  *See* Gov't's Post Hearing Resp. at 11-18, ECF No. 243.

An individual's *Miranda* protections are triggered "only when the [individual] is both in custody and being interrogated." *United States v. Lawrence*, 952 F.2d 1034, 1036 (8th Cir.), *cert. denied*, 503 U.S. 1011 (1992); *accord Miranda v. Arizona*, 384 U.S. 436 (1966).  To determine whether an individual is "in custody" for *Miranda* purposes, courts look to "'whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.'"  *United States v. Czichray*, 378 F.3d 822, 826 (8th Cir. 2004) (quoting *California v. Beheler*, 463 U.S. 1121, 1125 (1983)).  "To answer that question, [courts] consider the totality of the circumstances that confronted the defendant at the time of questioning, and inquire whether a reasonable person would have felt that he

or she was free to terminate the interview and leave." *United States v. Williams*, 760 F.3d

811, 814 (2014) (citing *Thompson v. Keohane*, 516 U.S. 99, 112 (1995)).

In *United States v. Griffin*, the Eighth Circuit set out six non-exhaustive factors for

courts to consider when determining whether an individual was in custody at the time of

questioning:

> (1) whether the suspect was informed at the time of questioning
> that the questioning was voluntary, that the suspect was free to
> leave or request the officers to do so, or that the suspect was
> not considered under arrest; (2) whether the suspect possessed
> unrestrained freedom of movement during questioning; (3)
> whether the suspect initiated contact with authorities or
> voluntarily acquiesced to official requests to respond to
> questions; (4) whether strong arm tactics or deceptive
> stratagems were employed during questioning; (5) whether the
> atmosphere of the questioning was police dominated; or (6)
> whether the suspect was placed under arrest at the termination
> of the questioning.

922 F.2d 1343, 1349 (8th Cir. 1990). "The first three indicia are mitigating factors which,

if present, mitigate against the existence of custody at the time of questioning. Conversely,

the last three indicia are aggravating factors which, if present, aggravate the existence of

custody." *United States v. Axsom*, 289 F.3d 496, 501 (8th Cir. 2002).

Importantly, whether someone is in custody "cannot be resolved merely by counting

up the number of factors on each side of the balance and rendering a decision accordingly."

*Czichray*, 378 F.3d at 827. The *Griffin* factors are "simply a rubric for considering the

ultimate issue, not a mandatory checklist[.]" *United States v. Perrin*, 659 F.3d 718, 720

(8th Cir. 2011). The ultimate question remains whether, under the totality of the

circumstances, Defendants Ying Chen and Li Yang felt they were at liberty to terminate

their interrogations and leave the interviews. *Id.* (citing *J.D.B. v. North Carolina*, 131 S. Ct. 2394, 2402 (2011)).

### 1. Ying Chen's Interview

On May 10, 2018, Bureau of Criminal Apprehension Special Agent Carrie Donarski ("SA Donarski") interviewed Defendant Ying Chen. *See generally* Ex. 17a; Ex. 17b. The interview was conducted in SA Donarski's vehicle, with the doors unlocked, and lasted less than 5 minutes and 30 seconds. *See* Ex. 17b at 2. Before the interview started, SA Donarski turned on the air in the car and told Defendant Ying Chen she could roll down the windows if she was hot. Ex. 17a at 00:13-00:18.

SA Donarski identified herself as a "state police" special agent with the Bureau of Criminal Apprehension and told Defendant Ying Chen that she was helping out with a case. *See* Ex. 17b at 1. Defendant responded that "[her] English is not very good" but she tries to understand. Ex. 17b at 1; Ex. 17a at 00:34-00:39. SA Donarski told her to let her know if she had any questions during the interview. Ex. 17b at 1. The following exchange then occurred:

| SA Donarski: | [T]he first thing that I want you to know, that I wanna make sure you understand is that you're not under arrest. |
| Ying Chen: | Okay. |
| SA Donarski: | Okay? You don't have to stay here. |
| Ying Chen: | Um-hm. |
| SA Donarski: | You don't have to be here. You don't have to talk to me. |

Ying Chen:            Okay.

Ex. 17b at 1; Ex 17a at 00:40-00:58.  SA Donarski and Defendant then discussed briefly

that officers executing the search warrant did not provide her with a copy of the search

warrant or any other paperwork.  Ex. 17b at 1-2.  SA Donarski then told Defendant, "[S]o

we're sitting in my car right now, right but, the doors are unlocked. Everything's open. If

you, you know, if you wanna go . . . we can go. Alright."  Ex. 17b at 2.  Defendant

responded, "mm-hmm," multiple times.  Ex. 17a at 01:42-01:45.

SA Donarski told Defendant that the search warrant was for her apartment and her

car, and she responded, "Um-hm" and "Okay." Ex. 17b at 2.  SA Donarski told Defendant,

"[W]hat we're investigating and what we're looking at right now . . . are the different

massage parlors . . . that are owned by you, (inaudible) whoever has massage parlors listed

in their name." Ex. 17b at 2.  SA Donarski told Defendant that she is listed as the owner

of a St. Louis Park massage parlor, and she responded that she was the owner, but the

massage parlor was shut down on December 31 when the city denied her license.  Ex. 17b

at 2-3; Ex. 17a at 02:00-03:23.  They then discussed whether Defendant had any plans to

reopen the massage parlor and whether she owned any other massage parlors or businesses.

Ex. 17b at 3; Ex. 17a at 03:23-04:35.  The following exchange then occurred:

Ying Chen:            So uh so uh so what, what is today's
                      about?

SA Donarski:          It's about massage parlors.

Ying Chen:            Okay. Okay.

SA Donarski:          Okay? So like your sister and Andrew.

24

> Ying Chen:        Can I uh, can I just ask my lawyer to talk
>                   about this later?
>
> SA Donarski:      Um-hm. Yup. Okay. Okay.

Ex. 17b at 3-4; Ex. 17a at 04:36-05:01.  SA Donarski then noted that it was May 10, 2018, at 10:42, and that she was shutting off her recorder.  Ex. 17b at 4; Ex. 17a at 05:01-05:23.  SA Donarski ended the interview and turned off her recorder.  Ex. 17a at 05:23.

Defendant Ying Chen testified about this interview at the hearing on December 9, 2022.  Two Mandarin Chinese interpreters were present in the courtroom and available for interpretation services, but Defendant testified in English, declining the services of the interpreters and stating that she was comfortable without using an interpreter.  Tr. 6:15-20, ECF No. 232.[2]  She testified that she came to the United States in 2013, considers her English to be "okay," and sometimes interprets between English and Mandarin Chinese for other individuals.  Tr. 12:17-21, 17:22-24, 18:10-18.

Defendant testified that on May 10, 2018, she was at her one-bedroom apartment in Plymouth.  Tr. 7:16-8:1.  Her mother was also there that day as her mother had recently had neck surgery and she was taking care of her.  Tr. 8:2-4.  At about 9:00 a.m., she heard very loud knocking at her door.  Tr. 8:11-14, 11:8-13.  She opened the door and observed around 20 or 30 police officers, who then rushed into her apartment.  Tr. 11:15-17.  They were in uniform, armed, and mostly men.  Tr. 11:16-23.  They told her to sit on the couch, and not to move, make any noise, or talk.  Tr. 12:4-7.  She testified that she obeyed their

---

[2] Although the transcript has been temporarily sealed to allow for the process of redacting any personal identifiers, *see generally* D. Minn. LR 5.5, the Court refers here to the redacted version of the transcript, which is set to be released on March 16, 2023.  ECF No. 232.

orders and did not feel "free to leave at all." Tr. 12:8-13. She testified that she was born and raised in China, where people cannot say "no" to law enforcement. Tr. 12:14-16, 12:24-13:1. While officers were searching her apartment, she sat on the couch and her mother laid on the bed in the bedroom because she could not move after her neck surgery. Tr. 13:11-14. She testified that she was "really, really worried" about her mother because she does not speak English and there were many male officers with guns in the apartment. Tr. 13:15-20.

After sitting on the couch for about an hour or hour and a half while officers searched her apartment, a female officer (SA Donarski) approached her. Tr. 13:2-10. According to Defendant, SA Donarski asked her if she could have a conversation with her. Tr. 13:21-14:2. SA Donarski then escorted Defendant from her apartment on the third floor to SA Donarski's car in the parking lot. Tr. 14:3-8. SA Donarski instructed Defendant to sit in the passenger's side of the car. Tr. 14:9-12. The doors were closed during the interview, but Defendant testified that she knew her door was unlocked. Tr. 15:1-3, 24:13-24.

She testified that SA Donarski told her that she was not under arrest, did not have to stay there, and did not have to talk to her. Tr. 22:17-24, 26:22-27:11. She was not handcuffed or arrested, no weapon was drawn on her, and SA Donarski never raised her voice or touched her. Tr. 22:25-23:11, 28:10-11, 30:2-10. SA Donarski also never made any false promises to her. Tr. 24:8-9. But Defendant testified that she felt a lot of pressure to answer SA Donarski's questions and did not feel free to leave or say "no" to SA Donarski. Tr. 24:1-7. Tr. 14:15-16, 15:4-5. She reiterated that she comes from China

where they "cannot say no to police officers" and are "scared of them." Tr. 15:17-23. She also testified that she was really stressed, and she felt that SA Donarski was "harsh." Tr. 23:5-8. At the time, SA Donarski had a gun, was in uniform, and police were still ransacking her apartment with her mother inside. Tr. 14:17-25. While SA Donarski told Defendant that she was free to leave, she testified that she only "kind of believe[d] her" because she had just been in her apartment with officers telling her she could not move, speak, or do anything, so she did not feel like she could leave when SA Donarski took her to her car. Tr. 15:6-16.

Defendant testified that at some point, she decided not to answer any more questions and asked to have an attorney. Tr. 15:24-25, 26:8-10, 27:12-14. She knew that she had the right to ask for an attorney because she had seen people ask for their attorneys in United States television shows and movies. Tr. 16:1-11, 26:14-16. While SA Donarski never told Defendant that she had the right to ask for an attorney, she ended the interview after Defendant asked for one. Tr. 16:12-17, 26:11-13. After the interview was over, Defendant still did not feel to leave because SA Donarski had escorted her from her apartment to the vehicle and she knew she would escort her back. Tr. 16:18-22, 27:22-24. When they got back to Defendant's apartment, SA Donarski told her to sit on the couch and not to move or talk again. Tr. 16:23-17:3, 27:25-28:3. She testified that she was not free to leave at that time. Tr. 17:4-5.

After careful review of the record, the Court determines that Defendant Ying Chen's motion to suppress statements should be denied because she was not in custody when she was questioned on May 10, 2018. Accordingly, her statements to SA Donarski need not

be suppressed. With respect to the first *Griffin* factor, Ying Chen argues that when she was speaking with SA Donarski, she was in custody for *Miranda* purposes because SA Donarski's "actions belied her words" that she was free to leave and not under arrest. *See* Def. Ying Chen's Post Hearing Mem. in Supp. at 8-9, ECF No. 236. The Court disagrees. "The most obvious and effective means of demonstrating that a suspect has not been taken into custody . . . is for the police to inform the suspect that an arrest is not being made and that the suspect may terminate the interview at will." *Williams*, 769 F.3d at 814 (quoting *Griffin*, 922 F.2d at 1349). Here, SA Donarski told Defendant several times, including at the outset of the questioning, that the questioning was voluntary, she was free to leave, and she was not under arrest. SA Donarski could not have been more clear: "The first thing that I want you to know, that I wanna make sure you understand is that you're not under arrest"; "You don't have to stay here"; "You don't have to be here"; "You don't have to talk to me"; "[I]f you wanna go . . . we can go. Alright." *See* Ex. 17b at 1-2; *see also* Ex. 17a at 00:40-00:58. SA Donarski also told Defendant to let her know if she had any questions during the interview. Ex. 17b at 1. Based on the totality of the circumstances, the Court determines that SA Donarski's statements to Defendant that she was not under arrest, did not have to stay and answer questions, and did not have to talk to her weigh in favor of a finding that Defendant was not in custody.

As for the second *Griffin* factor, whether the suspect possessed unrestrained freedom of movement during questioning, Defendant argues that she did not have unrestrained freedom of movement before, during, or after questioning. Def. Ying Chen's Post Hearing Mem. in Supp. at 9, ECF No. 236. She cites the fact that she was instructed

to sit on her couch silently for an hour and a half before the interview, was then taken to a small, enclosed space while SA Donarski questioned her, and was then escorted back to the apartment and instructed to sit silently again while officers finished the search. *Id*. Similarly, she argues that the third *Griffin* factor, whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions, weighs in favor of finding that she was in custody because she only spoke with law enforcement at SA Donarski's specific request to do so. *Id*. at 9-10.

While the interview did take place while agents were executing a search warrant inside her residence, Defendant voluntarily acquiesced to speaking with SA Donarski. According to Defendant's testimony at the hearing, SA Donarski approached her while she was sitting on the couch at her apartment and asked her if she would have a conversation with her. She agreed. There is no evidence that she was pressured into walking to SA Donarski's car with her. SA Donarski did not restrain Defendant or brandish her weapon at her when she asked if she would be willing to speak with her. When they got to SA Donarski's vehicle, SA Donarski told Defendant several times that she was not under arrest, that she did not have to stay in the car with her, and that she did not have to talk to her. Defendant voluntarily agreed to respond to SA Donarski's questions. And although the doors to SA Donarski's vehicle were closed, she was told she could open the windows and she testified that she knew the passenger side door where she was sitting was unlocked. She was not handcuffed or otherwise restrained physically. Further, Defendant does not allege that SA Donarski used strong arm tactics or deceptive stratagems, the fourth *Griffin* factor, during questioning. SA Donarski and Defendant had a relaxed, cooperative

conversation. SA Donarski never raised her voice, made false promises, or touched Defendant. The interview lasted less than five-and-a-half minutes before Defendant elected to terminate the questioning. On balance, these factors weigh in favor of finding that Defendant was not in custody because the evidence reflects that Defendant voluntarily agreed to answer SA Donarski's questions, she had unrestrained freedom of movement during the questioning, and SA Donarski did not use strong-arm tactics or deceptive stratagems during the interview.

"Although the fifth *Griffin* factor (*i.e.*, whether the atmosphere of the questioning was police dominated) is a closer call because [Defendant] was asked to be interviewed in a small space (a police [vehicle]), rather than in [her] home, . . . this Court concludes the factor does not tip the scale to turn this particular interview into a custodial interrogation." *See Untied States v. Steele*, No. 17-cr-143 (JRT/BRT), 2017 WL 8944015, at *5 (D. Minn. Sept. 20, 2017), *report and recommendation adopted*, 2017 WL 5611557 (D. Minn. Nov. 21, 2017). While several law enforcement agents were executing a search warrant at Defendant's residence at the time and she was escorted to SA Donarski's vehicle for the interview, SA Donarski told her she was free to leave, she did not have to answer her questions, and did not threaten or promise her anything. *See United States v. Perrin*, 659 F.3d 718, 721 (8th Cir. 2011). The tone of the conversation was relaxed and conversational. Further, Defendant herself terminated the interview after less than five-and-a-half minutes by asking for an attorney and to "talk about this later." Even if the atmosphere was police dominated, this factor does not tip the scale in favor of custody.

Lastly, the sixth *Griffin* factor, whether the suspect was placed under arrest at the termination of the questioning, weighs in favor of finding that Defendant was not in custody because she was not placed under arrest at the termination of questioning.

Based on the totality of the circumstances, a reasonable person in Defendant Ying Chen's position would have felt free to terminate the encounter.  In fact, she did. Accordingly, she was not in custody for *Miranda* purposes, and the Court recommends her Motion to Suppress Statements as a Result of Unlawful Interrogation, ECF No. 191, be denied.

### 2.  Li Yang's Interviews

On May 10, 2018, at approximately 10:45 a.m., Anoka County Sheriff's Office Detective Thomas Strusinski interviewed Defendant Li Yang.  *See generally* Ex. 15a; Ex. 15b.  Detective Strusinski got a Mandarin Interpreter on the phone, who translated for Defendant.  *See generally* Ex. 15a; Ex. 15b.  Special Agent Lars Propes ("SA Propes") was also present for the interview.  *See* Ex. 15b at 1.

Detective Strusinski told Defendant Li Yang that officers have been investigating a human trafficking organization that she is involved with since 2016.  *See* Ex. 15b at 2.  He explained that officers were currently executing search warrants on at least twenty locations.  *See* Ex. 15b at 2.  He then told Defendant, "I want to make it very clear to you . . . that you are not under arrest today. You are not being detained right now at all."  *See* Ex. 15b at 2; *see* Ex. 15a at 03:35-04:10.  Defendant responded, "Mmm."  *See* Ex. 15b at 2.  Detective Strusinski told Defendant, "You do not have to talk to me if you do not want to."  *See* Ex. 15b at 2; *see* Ex 15a at 04:17-04:29.  Defendant replied, "Um, I don't know

anything about it at all." *See* Ex. 15b at 3. She asked, "What you're talking about investigating and I don't . . . I know nothing about it." *See* Ex. 15b at 3. Detective Strusinski then asked Defendant if she "drive[s] girls to a massage parlor in White Bear Lake." *See* Ex. 15b at 3. She responded that the parlor is operated by her husband, and she does drive girls to and from the massage parlor. *See* Ex. 15b at 3.

At one point during the interview, Defendant Li Yang stopped using the services of the interpreter and started answering questions herself. Defendant later stated that she was best friends with Defendant Jing Chen, her husband Andrew Venere, and Defendant Ying Chen. *See* Ex. 15b at 10; *see* Ex. 15a at 16:08-17:21. When Detective Strusinski started asking questions about employees providing sexual acts in the massage business, he asked the interpreter to start interpreting for Defendant. *See* Ex. 15b at 12. Detective Strusinski and Defendant then discussed additional topics, with Defendant using interpreting services as needed. The interview concluded at 11:26 a.m. *See* Ex. 15b at 21.

Detective Strusinski interviewed Defendant Li Yang a second time after speaking with her husband. *See* Ex. 16b at 2. SA Propes was also present. *See* Ex. 16b at 10. Using a Mandarin Chinese interpreter, Detective Strusinski began the second interview with the following exchange:

| Detective Strusinski: | Um, Li, as I told you earlier, you're not under arrest. |
| Li Yang: | Mm-hmm. Yes. |
| Detective Strusinski: | And you don't have to talk to me if you don't want to. I just have some follow up questions. Are you willing to talk to me? |
| Li Yang: | Okay |

*See* Ex. 16b at 1; *see* Ex. 16a at 01:54-02:25.  Detective Strusinski asked questions about the massage parlor, the workers, financials, Defendant Ying Chen, Back Page ads, and properties, among other information.  *See generally* Ex. 16a; Ex. 16b.  The interview lasted about 24 minutes and concluded at 1:09 p.m.  *See* Ex. 16b at 10; *see also* Ex. 16a.

Defendant Li Yang contends that her statements should be suppressed because the totality of the circumstances surrounding the interrogation led her to believe she was under the officer's control and required to cooperate with him.  Def. Li Yang's Post Hearing Mem. in Supp. at 10, ECF No. 235.  Specifically, Defendant notes that

> [a]rmed officers had invaded her home and were ransacking it. She was escorted, under and [sic] officer's control, to an official vehicle in the parking lot. She was placed inside the vehicle and questioned. Compounding matters, Li Yang was not raised in this country but in a foreign nation governed by a repressive dictatorial regime where noncompliance with law enforcement officials was simply not permitted.

*Id*.  She argues that these circumstances demonstrate that she was in custody at the time of her interrogation and *Miranda* warnings were therefore required.  *Id*.

For nearly identical reasons to those discussed *supra* in Section II.C.1 with respect to Defendant Ying Chen's motion to suppress, which the Court incorporates by reference here, the Court finds that Defendant Li Yang was not in custody when she was questioned by Detective Strusinski on May 10, 2018, and her statements therefore need not be suppressed.  The first *Griffin* factor weighs in favor of finding that Defendant was not in custody because Detective Strusinski told her, at the outset of both of her interviews, that she was not being arrested and did not need to speak with him.  *See Williams*, 769 F.3d at

814 ("The most obvious and effective means of demonstrating that a suspect has not been taken into custody . . . is for the police to inform the suspect that an arrest is not being made and that the suspect may terminate the interview at will.").  During the first interview, Detective Strusinski told Defendant, "I want to make it very clear to you . . . that you are not under arrest today. You are not being detained right now at all."  *See* Ex. 15b at 2; *see* Ex. 15a at 03:35-04:10.  Detective Strusinski then said, "You do not have to talk to me if you do not want to."  *See* Ex. 15b at 2; *see* Ex 15a at 04:17-04:29.  Similarly, during the second interview, Detective Strusinski told Defendant, "as I told you earlier, you're not under arrest," and "you don't have to talk to me if you don't want to."  *See* Ex. 16b at 1; *see* Ex. 16a at 01:54-02:25.  Further, Detective Strusinski asked Defendant directly if she was "willing to talk to [him], to which she responded, "Okay."  *See* Ex. 16b at 1; *see* Ex. 16a at 01:54-02:25.  Having considered the totality of the circumstances, Detective Strusinski's statements to Defendant that she was not under arrest and she did not have to talk to him weigh in favor of finding that she was not in custody at the time she spoke with Detective Strusinski.

An analysis under the second, third, and fourth *Griffin* factors (*i.e.*, whether the suspect possessed unrestrained freedom of movement during questioning, whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions, and whether the agent used strong arm tactics or deceptive stratagems during questioning) also leads to the conclusion that Defendant Li Yang was not in custody during her interviews.  While the interviews did take place while agents were executing a search warrant inside her residence, Defendant voluntarily acquiesced to speaking with

Detective Strusinski.  Like Defendant Ying Chen's interview, there is no evidence that Defendant Li Yang was pressured into going to Detective Strusinski's vehicle to make the statements.  Nor is there evidence that Detective Strusinski or others restrained her, brandished their weapons at her, or otherwise used strong arm tactics or deceptive stratagems during questioning.  Detective Strusinski did not raise his voice at Defendant, make false promises, or threaten her, and Defendant answered questions willingly.  The two interviews combined lasted just about one hour.  Considering these factors, they weigh in favor of finding that Defendant Li Yang was not in custody because she voluntarily agreed to answer Detective Strusinski's questions, she had unrestrained freedom of movement during the questioning, and Detective Strusinski did not use strong-arm tactics or deceptive stratagems during the interviews.

The fifth *Griffin* factor, whether the atmosphere of the questioning was police dominated, does not "tip the scale" in favor of custody.  *See Steele*, 2017 WL 8944015, at *5 ("Although the fifth *Griffin* factor . . . is a closer call because [Defendant Li Yang] was asked to be interviewed in a small space (a police [vehicle]), rather than in [her] home, . . . this Court concludes the factor does not tip the scale to turn this particular interview into a custodial interrogation.").  Although several law enforcement agents were executing a search warrant at Defendant's residence at the time and she was brought to Detective Strusinski's vehicle for the interview, he told her she was not under arrest and did not have to talk to him if she did not want to, and he did not threaten her or promise her anything. *See Perrin*, 659 F.3d at 721.  The tone of the conversation was conversational, and Defendant provided information willingly.  Even if the atmosphere was police dominated,

this factor does not tip the scale in favor of custody.  Finally, the sixth *Griffin* factor, whether the suspect was placed under arrest at the termination of the questioning, also weighs in favor of finding that Defendant was not in custody because she was not placed under arrest at the termination of questioning.

In sum, based on the totality of the circumstances, a reasonable person in Defendant Li Yang's position would have felt free to terminate the encounters with Detective Strusinski.  Thus, the Court concludes that she was not in custody for *Miranda* purposes and recommends that her Motion to Suppress Statements, Admissions and Answers, ECF No. 179, be denied.

### D.  Motions to Dismiss Indictment for Failure to State an Offense

Defendant Jing Chen moves to dismiss the Indictment for failure to state an offense under Federal Rule of Criminal Procedure 12(b)(3)(B)(v).  ECF No. 89 at 1.  She contends that the Indictment "failed to provide factual grounds for the allegations that [she] has acted unlawfully," and the Government therefore "has not asserted a valid and legal claim against [her]."  *Id*.; *see also* Def. Jing Chen's Mem. in Supp. at 1, ECF No. 90; Def. Jing Chen's Post Hearing Mem. in Supp. at 4, ECF No. 237.  Defendant Xinhua Xiong also moves to dismiss Count 1 of the Indictment for failure to state an offense, contending that the Indictment does not contain the necessary elements for the alleged crime.  ECF No. 56; Def. Xinhua Xiong's Post Hearing Mem. in Supp. at 6-9, ECF. No. 233.  The Government argues that the Indictment is sufficiently plead and adequately states the offenses against Defendants Jing Chen and Xinhua Xiong.  *See* Gov't's Post Hearing Resp. at 2-3, 20-21, ECF No. 243; *see also* Gov't's Resp. at 14, ECF No. 198.

Under the Federal Rules of Criminal Procedure, an indictment "must be a plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1). An indictment must provide the facts and circumstances to "adequately inform the accused of the specific offense." *United States v. Hecker*, No. 10-cr-32 (JNE/SRN), 2010 WL 3463393, at *8 (D. Minn. July 6, 2010) (citing *Hamling v. United States*, 418 U.S. 87, 117 (1974)). An indictment adequately states an offense if

> it contains all of the essential elements of the offense charged, fairly informs the defendant of the charges against which [s]he must defend, and alleges sufficient information to allow a defendant to plead a conviction or acquittal as a bar to a subsequent prosecution. An indictment will ordinarily be held sufficient unless it is so defective that it cannot be said, by any reasonable construction, to charge the offense for which the defendant was convicted.

*United States v. Sewell*, 513 F.3d 820, 821 (8th Cir. 2008) (citing *United States v. Hernandez*, 299 F.3d 984, 992 (8th Cir. 2002)). "An indictment is normally sufficient if its language tracks the statutory language." *Id.* (citing *Hamling v. United States*, 418 U.S. 87, 117 (1974)).

Here, the Indictment complies with the requirements of Rule 7(c)(1). It clearly lists each charge against Defendant Jing Chen and identifies the statute she is alleged to have violated: Count 1 (Conspiracy To Commit Transportation To Engage in Prostitution), in violation of 18 U.S.C. §§ 371, 2421; Count 2 (Conspiracy To Use a Communication Facility To Promote Prostitution), in violation of 18 U.S.C. §§ 371, 1952; Count 3 (Conspiracy To Engage in Money Laundering), in violation of 18 U.S.C. § 1956; and

Counts 4-5 (Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity), in violation of 18 U.S.C. § 1957. ECF No. 1. Similarly, the Indictment lists each charge against Defendant Xinhua Xiong, namely, Counts 1 through 3 as described above, and identifies the statute she is alleged to have violated. For each count, the Indictment alleges that Defendants Jing Chen and Xinhua Xiong committed the necessary elements of the offense. Thus, the information contained in the Indictment is specific enough to inform Defendants of the charges against them and ensure that they are not indicted in another prosecution for the same conduct.

For example, in Count 1, the Indictment alleges that Defendants Jing Chen and Xinhua Xiong violated 18 U.S.C. §§ 371, 2421 (Conspiracy To Commit Transportation To Engage in Prostitution) from in or about 2014 through in or about May 2018 by conspiring with the other Defendants and others to commit an offense against the United States, and one or more did an act to effect the object of the conspiracy,[3] that is, knowingly transporting any individual in interstate and foreign commerce with intent that such individual engage in prostitution and in any sexual activity for which any person can be charged with a criminal offense, in violation of 18 U.S.C. § 2421.[4] ECF No. 1 at 1-2. The Indictment then explains the purpose of the conspiracy, namely, "for the organization to make money by arranging for women to travel to Minnesota from California and New York and, at

---

[3] "If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years, or both." 18 U.S.C. § 371.

[4] "Whoever knowingly transports any individual in interstate or foreign commerce . . . with intent that such individual engage in prostitution, or in any sexual activity for which any person can be charged with a criminal offense, or attempts to do so, shall be fined under this title or imprisoned not more than 10 years, or both." 18 U.S.C. § 2421.

various illicit massage businesses throughout the Twin Cities Metro Area, to engage in commercial sex acts for the financial benefit of the conspiracy." *Id*. at 2. It also details the manner and means of the conspiracy, specifically, "[t]o achieve the purpose of the conspiracy, the defendants, together with others . . . , transported multiple women in interstate and foreign commerce, including in the State and District of Minnesota and elsewhere, with the intent that such individuals engage in prostitution and in any sexual activity for which any person can be charged with a criminal offense, and attempted to do so." *Id*. The Indictment then lists five overt acts Defendants committed. *Id*. at 2-3. For example, it states that

> [o]n or about April 15, 2015, [Defendant] Jing Chen purchased a Sun Country ticket for L.S. to travel from Los Angeles, California, to the Minneapolis/St. Paul International Airport. On November 16, 2015, L.S. filed for a 2016 massage license application to work at the illicit massage business known as Zentastic Spa in St. Louis Park, Minnesota. On October 18, 2016, L.S. offered a commercial sex service to an adult male at Zentastic Spa.

*Id*. at 2. As another example, "[o]n or about December 9, 2017, [Defendants] Jing Chen and Xinhua Xiong exchanged the flight itinerary for a worker named 'Anna' arriving from LaGuardia, New York, at the Minneapolis/St. Paul International Airport the following day." *Id*. at 3. The Court finds that the specificity of the facts alleged in the Indictment for Count 1 are sufficient to inform Defendants of what acts constitute the charges and provide them with sufficient protection against double jeopardy. Having reviewed the Indictment in its entirety, the Court concludes that it contains all of the essential elements of the offenses charged, fairly informs Defendants of the charges against them, and alleges

sufficient information for Defendants to plead a conviction or acquittal as a bar to a subsequent prosecution.

Defendant Jing Chen argues that the Government failed to provide a factual basis for its pleadings because it did not specifically "provide a factual basis for its allegations that [she] had intent to commit an unlawful act or had an agreement with another party to carry out an unlawful act." Def. Jing Chen's Post Hearing Mem. in Supp. at 7-8, ECF No. 237. Similarly, Defendant Xinhua Xiong argues that the Government did not provide a factual basis for its allegations that she transported workers with intent that such individuals engage in prostitution or that any prostitution or illegal sex act ever occurred at the various massage parlors. Def. Xinhua Xiong's Post Hearing Mem. in Supp. at 6-8, ECF. No. 233. This Court disagrees. The Indictment alleges the essential elements of the offenses that Defendants conspired with each other and others to commit transportation to engage in prostitution, use a communication facility to promote prostitution, and engage in money laundering. It fairly informs Defendants of the charges against them and alleges sufficient information to allow them to exercise their Fifth Amendment double jeopardy rights. *See, e.g., United States v. Osborne*, No. 08-cr-142 (DSD/SRN), 2008 WL 5104259, at *2 (D. Minn. Nov. 25, 2008). The Court cannot say that the Indictment here is "so defective that it cannot be said, by any reasonable construction, to charge the offense[s] for which [Defendants]" are charged. *See Hernandez*, 299 F.3d at 992. Accordingly, the Indictment is sufficient under Rule 7(c)(1).

Lastly, Defendant Xinhua Xiong argues that the Indictment is duplicitous as it inappropriately joins multiple offenses in a single count. Def. Xinhua Xiong's Post

Hearing Mem. in Supp. at 2, ECF. No. 233.  Specifically, Defendant Xinhua Xiong argues that Count 1 includes at least three separate offenses involving separate massage parlor locations and alleged transported workers occurring between 2015 and 2017.  *Id*. at 3. According to Defendant Xinhua Xiong, Count 1 should be dismissed because "a jury may convict [her] without unanimous agreement on [her] guilt with respect to a particular offense."  *Id*. at 4.  Further, she argues that the Government has inappropriately connected her to the other Defendants "with whom she had no business agreement or relationship." *Id*.

"Duplicity is the joining in a single count of two or more distinct and separate offenses."  *United States v. Nattier*, 127 F.3d 655, 657 (8th Cir. 1997) (quoting *United States v. Street*, 66 F.3d 969, 974 (8th Cir. 1995)).  "The principal vice of a duplicitous indictment is that the jury may convict a defendant without unanimous agreement on the defendant's guilt with respect to a particular offense."  *Id*. (quoting *United States v. Karam*, 37 F.3d 1280, 1286 (8th Cir. 1994)).  But, contrary to Defendant Xinhua Xiong's argument, Count 1 is not duplicitous because "[t]he allegation in a single count of a conspiracy to commit several [offenses] is not duplicitous, for [t]he conspiracy is the crime, and that is one, however diverse its objects."  *Braverman v. United States*, 317 U.S. 49, 54 (1942) (quotations and citations omitted); *see also United States v. Adams*, No. 15-cr-106 (PJS/FNL), 2016 WL 385965, at *10 (D. Minn. Jan. 7, 2016) (citing *United States v. Bauer*, 84 F.3d 1549, 1560 (9th Cir. 1996) ("An indictment is not duplicitous merely because it charges a conspiracy to commit more than one offense.")), *report and recommendation adopted*, 2016 WL 386035 (D. Minn. Feb. 1, 2016).  Regardless, the risk in a duplicitous

41

count "may be cured by a limiting instruction requiring the jury to unanimously find the defendant guilty of at least one distinct act." *Id*. (citing *Karam*, 37 F.3d at 1286); *see also United States v. Yielding*, 657 F.3d 688, 702-03 (8th Cir. 2011). Thus, even assuming for the sake of Defendant Xinhua Xiong's argument that Count 1 is duplicitous, dismissal of the count is not the appropriate remedy. Rather, as the Government correctly points out, "an instruction from the Court on the Count 1 conspiracy that the jury should consider each defendant's case separately is appropriate." *See* Gov't's Post Hearing Resp. at 4, ECF No. 243. Thus, to the extent the district court has a concern about duplicity at trial, a limiting instruction may be appropriate to cure such risk.

In sum, the Court finds that the Indictment is sufficient under Rule 7(c)(1) because it contains all of the essential elements of the offenses charged, fairly informs Defendants of the charges against them, and alleges sufficient information for Defendants to plead a conviction or acquittal as a bar to a subsequent prosecution. Accordingly, the Court recommends that Defendant Jing Chen's Motion to Dismiss Indictment for Failure to State an Offense, ECF No. 89, be denied. The Court also recommends that, to the extent Defendant Xinhua Xiong requests dismissal of the Indictment for failure to state an offense, her Pretrial Motion for Dismissal of Indictment, ECF No. 56, be denied.[5]

### E. Motions to Dismiss Indictment on Statute of Limitations Grounds

Defendants Jing Chen and Xinhua Xiong move to dismiss Count 1 (Conspiracy To Commit Transportation To Engage in Prostitution) and Count 3 (Conspiracy To Engage in

---

[5] Defendant Xinhua Xiong's Pretrial Motion for Dismissal of Indictment, ECF No. 56, also includes a statute of limitations argument. The Court addresses that portion of her motion, *infra*, in the next section.

Money Laundering) of the Indictment, arguing that they fall outside the five-year statute of limitations. *See* Def. Jing Chen's Motion to Dismiss at 1-3, ECF No. 91; Def. Jing Chen's Post Hearing Mem. in Supp. at 8-9, ECF No. 237; Def. Xinhua Xiong's Mem. in Supp. at 6-7, ECF No. 57; Def. Xinhua Xiong's Post Hearing Mem. in Sup. at 4-6, ECF No. 233. The Government contends that Counts 1 and 3 are both within the five-year statute of limitations. *See* Gov't's Post Hearing Resp. at 4-5, 21-23, ECF No. 243.

Under the statute of limitations, "no person shall be prosecuted, tried, or punished for any offense, not capital, unless the indictment is found or the information is instituted within five years next after such offense shall have been committed." 18 U.S.C. § 3282. The parties agree that the five-year statute of limitations runs from the date of the last overt act that occurred within the existence of the conspiracy. *See* Def. Jing Chen's Motion to Dismiss at 2, ECF No. 91 ("[T]he statute of limitations runs from the last overt act that occurred within the existence of the conspiracy."); Def. Xinhua Xiong's Post Hearing Mem. in Supp. at 4-5, ECF No. 233 ("[A] five-year statute of limitations for prosecutions . . . begins running as soon as the offense is complete."); Gov't's Post Hearing Resp. at 5, 22, ECF No. 243 ("[T]he statute of limitations does not . . . begin to run until the last overt act is committed."); *see also United States v. Perry*, 152 F.3d 900, 904 (8th Cir. 1998) ("When a defendant is charged with conspiracy, as here, the limitations period commences 'from the occurrence of the last overt act committed in furtherance of the conspiracy.'") (quoting *United States v. Dolan*, 120 F.3d 856, 864 (8th Cir. 1997)). Thus, where, as here, Defendants challenge the timeliness of the conspiracy charges, "to prevent the indictment from being found defective on its face, the government must allege and prove the

commission of at least one overt act by one of the conspirators within [the five-year] period in furtherance of the conspiratorial agreement." *Dolan*, 120 F.3d at 864 (quotation and citation omitted). Therefore, in this case, the Indictment must state at least one overt act by one of the conspirators in furtherance of the conspiracy that occurred on or after November 23, 2016, five years prior to the original Indictment in this case. *See id*.

Defendant Jing Chen argues that only one overt act alleged in Count 1 "in relation to [her]" falls within the statute of limitations, namely, the allegation that "[o]n or about December 9, 2017, [Defendants] Jing Chen and Xinhua Xiong exchanged the flight itinerary for a worker named 'Anna' arriving from LaGuardia, New York, at the Minneapolis/St. Paul International Airport the following day." Def. Jing Chen's Motion to Dismiss at 2, ECF No. 91; *see also* ECF No. 1 at 3. According to Defendant Jing Chen, this overt act "is not valid in an allegation of conspiracy" because it "does not connect her 'exchange' with [Defendant] Xinhua Xiong with an illegal act." Def. Jing Chen's Motion to Dismiss at 2, ECF No. 91. Defendant Xinhua Xiong argues that the only overt act in the Indictment that alleges a "commercial sex act" occurred in October 2016, which is outside the statute of limitations. Def. Xinhua Xiong's Post Hearing Mem. in Supp. at 5-6, ECF No. 233.

Defendants, however, read Count 1 of the Indictment too narrowly. The overt acts alleged in the Indictment need not alone establish proof of a "commercial sex act" or another "illegal act." Instead, the Indictment need only allege "the commission of at least one overt act by one of the conspirators within [the five-year] period in furtherance of the conspiratorial agreement." *Dolan*, 120 F.3d at 864. Here, Count 1 alleges that Defendants

44

"transported multiple women in interstate and foreign commerce . . . with the intent that such individuals engage in prostitution and in any sexual activity for which any person can be charged with a criminal offense . . . ." ECF No. 1 at 2. The overt act from December 9, 2017, specifically, that "[Defendants] Jing Chen and Xinhua Xiong exchanged the flight itinerary for a worker named 'Anna' arriving from LaGuardia, New York, at the Minneapolis/St. Paul International Airport the following day," is within the statute of limitations and clearly an act in furtherance of the conspiracy to transport women to Minnesota to work at the illicit massage businesses.

Moreover, the Indictment alleges two additional overt acts in furtherance of the conspiracy by Defendants Ying Chen and Li Yang and that are within the statute of limitations. *See Dolan*, 120 F.3d at 864 ("The government, to prevent the indictment from being found defective on its face, 'must allege and prove the commission of at least one overt act *by one of the conspirators* within [the five-year] period in furtherance of the conspiratorial agreement.") (quoting *Davis*, 533 F.2d at 926) (emphasis added). The Indictment alleges that, within the statute of limitations period, Defendant "Ying Chen. . . pick[ed] up a female at the Minneapolis/St. Paul International Airport . . . who then filed for a massage license application the same day at the illicit massage business known as Jade Massage in White Bear Lake." ECF No. 1 at 3. It also alleges that Defendants "Ying Chen and Li Yang communicated about a new massage worker arriving at the Greyhound Station. Ying Chen instructed Li Yang to pick up the worker and that Ying Chen would complete a massage license application for her before directing her to the illicit massage business . . . ." *Id*. These acts are also properly regarded as in furtherance of the conspiracy

45

to transport women to Minnesota with the intent that such individuals engage in prostitution. Thus, the Government successfully alleged in Count 1 the commission of at least one overt act in furtherance of the conspiracy by at least one of the conspirators within the statute of limitations period.

Defendants Jing Chen and Xinhua Xiong also argue that Count 3 must be dismissed because "there are no overt acts alleged to establish the Government is within the statute of limitations for this charge." Def. Jing Chen's Motion to Dismiss at 2, ECF No. 91; *see also* Xinhua Xiong's Mem. in Supp. at 6-7, ECF No. 57. Defendants' arguments fail, however, because the Indictment need not allege any overt acts for Count 3. The Indictment charges Defendants in Count 3 with Conspiracy To Engage in Money Laundering in violation of 18 U.S.C. § 1956(h). ECF No. 1 at 6-8. The Supreme Court has made clear that "conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h), does not require proof of an overt act in furtherance of the conspiracy." *See Whitfield v. United States*, 543 U.S. 209, 219 (2005) (upholding conviction where indictment charged defendants with conspiracy to launder money in violation of § 1956(h) but did not allege any overt acts committed in furtherance thereof); *see also, e.g., United States v. Musick*, 291 Fed.Appx. 706, 715 (6th Cir. 2008) ("The indictment does not charge an overt act. The Supreme Court's *Whitfield* opinion clearly states that an overt act is not a necessary element of a § 1956(h) prosecution. Hence, it need not be charged in the indictment, and the indictment in this case adequately charged the offense."). Thus, Count 3 need not be dismissed simply because no overt acts are alleged in the Indictment.

The charges brought against Defendants in the Indictment are within the statute of limitations. Accordingly, the Court recommends that Defendant Jing Chen's Motion to Dismiss First and Third Count of Defendant's Charge Due to Statute of Limits Expiration, ECF No. 91, be denied. The Court also recommends that, to the extent Defendant Xinhua Xiong requests dismissal of the Indictment on statute of limitations grounds, her Pretrial Motion for Dismissal of Indictment, ECF No. 56, be denied.[6]

### F. Motion to Dismiss the Indictment Under *Lawrence v. Texas*

Defendant Li Yang moves to dismiss Count 1 of the Indictment on the grounds "that 18 U.S.C. § 2421 infringes on the due process rights of Defendant to engage in private, consensual sexual practices, absent any allegation of harm or coercion." Def. Li Yang's Motion to Dismiss at 3, ECF No. 178. Defendant Li Yang concedes that 18 U.S.C. § 2421, otherwise known as the Mann Act, "has been upheld in the face of prior constitutional challenges." Def. Li Yang's Post Hearing Mem. in Supp. at 2, ECF No. 235. Nonetheless, she contends under a more recent Supreme Court decision, *Lawrence v. Texas*, 539 U.S. 558 (2003), the Court should find that "the type of consensual behavior described in the Indictment cannot be criminalized by the government." Def. Li Yang's Post Hearing Mem.

---

[6] Defendant Xinhua Xiong filed her Pretrial Motion for Dismissal of Indictment on January 4, 2022. ECF No. 56. At the time, Defendant moved to dismiss the Indictment, in part, "due to unreasonable delay by the Government which substantially prejudices [her] in violation of the Fifth and Sixth Amendment to the US Constitution." ECF No. 56; *see also* Def. Xinhua Xiong's Mem. in Supp. at 7-8, ECF No. 57. Defendant does not make any unreasonable delay-related arguments in her Post Hearing Memorandum, ECF No. 233. To the extent Defendant still moves to dismiss the Indictment due to unreasonable delay, however, the Court recommends the motion be denied. The Court addressed the same argument made by Defendant Jing Chen in a November 30, 2022 Report and Recommendation, recommending that her motions to dismiss for pre-indictment delay be denied. The district court adopted that Report and Recommendation on February 2, 2023 and denied the motions. *See United States v. Chen*, No. 21-cr-250 (1) (JRT/TNL), 2023 WL 1466503 (D. Minn. Feb. 2, 2023). The Court incorporates its Report and Recommendation by reference here.

in Supp. at 4, ECF No. 235.  The Government responds that that there is no case law on point supporting Defendant Li Yang's argument that the Mann Act is unconstitutional. Gov't's Post Hearing Resp. at 6, ECF No. 243.  The Government also argues that *Lawrence* is "readily distinguishable" from this case because Congress can regulate interstate commerce and transportation, which it does through the Mann Act.  *Id*. at 5.

Count 1 of the Indictment charges Defendant Li Yang with Conspiracy To Commit Transportation To Engage in Prostitution under 18 U.S.C. § 2421.  Otherwise known as the Mann Act, § 2421 prohibits the act of "knowingly transport[ing] any individual in interstate or foreign commerce . . . with intent that such individual engage in prostitution, or in any sexual activity for which any person can be charged with a criminal offense . . . ."  18 U.S.C. § 2421(a).  As the Government notes, and Defendant Li Yang concedes, the Eighth Circuit has upheld the Mann Act in the face of prior constitutional challenges.  In 1975, for example, the Eighth Circuit wrote:

> It is rather late in the history of the Mann Act to still be contending for its unconstitutionality. The Act has been consistently upheld beginning with the early decisions in *Caminetti v. United States*, . . . and *Hoke v. United States* . . . . * * * At the time the statute was enacted it was directed at stopping the traffic in women 'by procurers who forced victims to lead a life of debauchery.' . . . As this case illustrates, such activities have not disappeared in over 60 years since enactment of the Mann Act.

*United States v. Garrett*, 521 F.2d 444, 446 (8th Cir. 1975) (citations omitted).  Over the last nearly fifty years since *Garrett*, its holding has remained undisturbed.  The Mann Act has not been found unconstitutional.

Defendant Li Yang relies on *Lawrence v. Texas* to argue "that the type of consensual behavior described in the Indictment cannot be criminalized by the government." Def. Li Yang's Post Hearing Mem. in Supp. at 4. Such argument is misguided and misunderstands the important constitutional and social issues addressed in *Lawrence*. There, the Supreme Court concluded that a Texas law criminalizing homosexual activity violated the due process clause because two adults mutually consenting to private sexual conduct have a due process right to engage in their conduct without interference of the government. 539 U.S. at 578. Defendant Li Yang attempts to apply the holding and reasoning of *Lawrence* to her case by quoting from *Lawrence*:

> The present case does not involve minors. It does not involve persons who might be injured or coerced or who are situated in relationships where consent might easily be refused . . . the case does involve two adults with full mutual consent from each other engaged in sexual practices . . .

Def. Li Yang's Post Hearing Mem. in Supp. at 3 (quoting 539 U.S. at 579). But Defendant Li Yang conveniently uses ellipsis to omit a key distinction between *Lawrence* and her case. *Lawrence* really says:

> The present case does not involve minors. It does not involve persons who might be injured or coerced or who are situated in relationships where consent might easily be refused. ***It does not involve public conduct or prostitution.*** . . . the case does involve two adults who, will full and mutual consent from each other, engaged in sexual practices . . .

539 U.S. at 578 (emphasis added). Defendant Li Yang's case *does* involve prostitution. In fact, the very count she moves to dismiss under the reasoning in *Lawrence* is Conspiracy To Commit Transportation *To Engage in Prostitution*. Unlike private, consensual

homosexual activity, "[i]t is difficult to conceive of prostitution as being constitutionally guaranteed and protected." *See United States v. Pelton*, 578 F.2d 701, 710 (8th Cir. 1978). Defendant's reliance on the analysis in *Lawrence* is therefore misplaced to say the least. She cites no other case law, nor can this Court find any, that supports Defendant's argument that the Mann Act is unconstitutional.

Accordingly, the Court recommends that Defendant Li Yang's Motion to Dismiss Count 1 of the Indictment, ECF No. 178, be denied.

## IV. RECOMMENDATION

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1. Defendant Jing Chen's Motion to Suppress Evidence Due to Non-Disclosure, ECF No. 85, be **DENIED**.

2. Defendant Jing Chen's Motion to Dismiss Indictment for Failure to State an Offense, ECF No. 89, be **DENIED**.

3. Defendant Jing Chen's Motion to Dismiss First and Third Count of Defendant's Charge Due to Statute of Limits Expiration, ECF No. 91, be **DENIED**.

4. Defendant Jing Chen's Motion to Suppress Evidence Pursuant to Unlawful Search and Seizure, ECF No. 92, be **DENIED**.

5. Defendant Ying Chen's Motion to Suppress Evidence Obtained as a Result of Unlawful Search and Seizure, ECF No. 188, be **DENIED**.

6. Defendant Ying Chen's Motion to Suppress Statements as a Result of Unlawful Interrogation, ECF No. 191, be **DENIED**.

7. Defendant Li Yang's Motion to Dismiss Count 1 of the Indictment, ECF No. 178, be **DENIED**.

8. Defendant Li Yang's Motion to Suppress Statements, Admissions and Answers, ECF No. 179, be **DENIED**.

9. Defendant Li Yang's Motion to Suppress Evidence Obtained as a Result of a Search and Seizure, ECF No. 181, be **DENIED**.

10. Defendant Xinhua Xiong's Pretrial Motion for Dismissal of Indictment, ECF No. 56, be **DENIED**.

Date: March ___9___, 2023

_____*s/Tony N. Leung*_____
Tony N. Leung
United States Magistrate Judge
District of Minnesota

*United States v. Chen et al.*
Case No. 21-cr-250 (JRT/TNL)

## NOTICE

**Filing Objections:**  This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation.  A party may respond to those objections within 14 days after being served a copy of the objections.  LR 72.2(b)(2).  All objections and responses must comply with the word or line limits set for in LR 72.2(c).

**Under Advisement Date:**  This Report and Recommendation will be considered under advisement 14 days from the date of its filing.  If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.